IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

HENRY BERDINE,                          )
                                        )
            Plaintiff,                  )
                                        )
    -vs-                                )        Civil Action No. 09-1076
                                        )
MICHAEL J. ASTRUE,                      )
COMMISSIONER OF SOCIAL SECURITY,        )
                                        )
            Defendant.                  )

## MEMORANDUM OPINION AND JUDGMENT ORDER

Gary L. Lancaster,
Chief District Judge.                                April **24**, 2010

This is an appeal from the final decision of the Commissioner of Social Security denying plaintiff's claim for Disability Insurance Benefits under Title II of the Social Security Act. Jurisdiction is proper pursuant to 42 U.S.C. § 405 (g). Plaintiff, Henry Berdine, alleges that the Administrative Law Judge's ("ALJ") decision that he was not disabled, and therefore not entitled to disability insurance benefits beginning on his alleged onset date of April 23, 2006, should be reversed or in the alternative remanded because the ALJ improperly disregarded the medical opinion of plaintiff's treating psychologist, failed to consider his employment record when assessing credibility, and improperly assessed plaintiff's residual functional capacity and relied on inaccurate hypothetical. For the reasons that follow, the Court will deny plaintiff's motion and grant defendant's motion.

I.    **Factual History**

Plaintiff was born on October 31, 1964 and was 44 years old at the time of the ALJ's decision. (R. 116). Plaintiff has a ninth grade education and worked as an extruder operator for West Penn Wire Company for twenty-three years. (R. 33, 159). During most of his time at WPWC, plaintiff worked day shift but was switched in 2002 to alternating day and night shifts.

(R. 159, 283). In November 2004, plaintiff requested that his primary care physician, Dr. Michael Maine, write a letter stating that he could not work the alternating shifts. (R. 348). WPWC refused to approve this request. (R. 346). In 2006, plaintiff sued WPWC for sexual harassment and discrimination. (R. 28, 357-58, 279, 467). Plaintiff stopped working at WPWC on April 23, 2006 and settled his case in May 2006. (R. 28, 138, 159, 257-58, 279, 467).

Plaintiff does not challenge the ALJ's findings with respect to his physical limitations, and therefore, this factual section will deal strictly with plaintiff's mental impairments. (Pl. Brief at 6). During 2004 and 2005, plaintiff was treated by his primary care physician, Dr. Michael Maine; his psychologist; and a therapist for anxiety. At the time, plaintiff was taking care of and living with both of his ailing parents. He had assumed all of the household duties, including cooking, cleaning, and other general chores. (R. 283). Dr. Maine attempted to treat plaintiff with several medications including Paxil, Zoloft, Lexapro, Prozac, and Effexor, which plaintiff reported were unsuccessful. (R. 351). Plaintiff was placed on Ativan and referred to Dr. Marraccini, a psychologist. *Id.* In June 2004, Plaintiff reported to his therapist that he was experiencing anxiety due to being the primary caregiver to his parents, coping with his brother's death, difficulties with mine subsidence affecting his house, the end of a bad relationship, and being placed on swing shifts at work. (R. 283). He was assessed with generalized anxiety disorder and a Global Assessment of Functioning (GAF) of 55. (R. 284).[1]

---

[1]The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. A GAF score of between 51-60 denotes moderate symptoms. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) 34 (4th ed. 2000). An individual with a GAF score of 60 may have "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning;" of 50 may have "[s]erious symptoms (e.g., suicidal ideation . . . .)" or "impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job);" of 40 may have "[s]ome impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking or mood; of 30 may have behavior "considerably influenced by delusions or hallucinations" or "serious impairment in communication or judgment (e.g., . . . suicidal preoccupation)" or "inability to function in almost all areas . . .; of 20 "[s]ome danger of hurting self or others . . . or occasionally fails to maintain minimal personal hygiene . . . or gross impairment in communication . . . ." *Id.*

2

On July 6, 2004, plaintiff had a medication check with Dr. Marraccini. Dr. Marraccini noted that plaintiff had a constricted affect with an anxious and depressed mood. He assessed plaintiff with a GAF of 55 and placed him on Effexor. (R. 292). On July 12, 2004, plaintiff reported to Dr. Maine that he had taken himself off Effexor after three days because it caused more anxiety and stress. (R. 350). Plaintiff also reported that he was experiencing episodes of passing out with associated facial numbness. *Id.* Plaintiff requested a slip for work due to these problems. *Id.* On July 27, 2004, plaintiff reported to his therapist that he had been granted an excuse from work for three months by his primary care physician. (R. 282). Plaintiff reported that he felt "something was wrong with his head" and reported numb feelings in his face and hands. His therapist noted that he had been started on Neurontin and Ativan. *Id.* On August 3, 2004, plaintiff saw Dr. Marraccini for a medication check and reported that he was feeling better on Neurontin and was not arguing as much with people. (R. 291). He reported no side effects. Dr. Maraccini noted that plaintiff presented with a restricted affect and anxious mood with a GAF of 60, indicative of moderate symptoms. Neurontin was continued and increased. *Id.*

At his next medication check on September 7, 2004, plaintiff reported that he stopped taking Neurontin because it made him unable to urinate. (R. 290). He reported that he was still anxious and had racing thoughts. *Id.* Plaintiff presented with a constricted affect, anxious mood, and racing thoughts. He was started on Seroquel and assessed with a GAF of 60. (R. 290). On September 27, 2004, plaintiff had a follow-up with Dr. Maine for irritable bowel syndrome related to his anxiety. (R. 347). He reported that he had discontinued Seroquel due to side effects and was experiencing high levels of stress. Plaintiff exhibited a guarded affect and anxiety. Dr. Maine recommended another three months off from work. *Id.*

On the same date, plaintiff was assessed by Dr. Scott Roberts for the Office of Vocational Rehabilitation. (R. 325). Plaintiff reported problems with anxiety stemming back to his childhood due to name calling in school. (R. 326). Plaintiff also reported name-calling at work and sexual harassment stemming from his homosexuality. *Id.* Plaintiff noted that he was experiencing difficulty sleeping and significant anxiety due to his switching shifts and panic attacks. He reported that he was taking Ativan three times a day or more and was on Neurontin. *Id.* During the examination, plaintiff was very anxious, exhibited a "rather limited" expressive vocabulary, and exhibited very little confidence in his abilities and engaged in self-deprecation.

3

(R. 327). Plaintiff reported anxiety and depression; panic attacks with intense anxiety, shortness of breath, and numbness in hands, arms, and mouth; disturbed sleep; appetite changes; hopelessness; experiencing little happiness in his life; and shame. *Id.* Dr. Roberts noted that plaintiff's affect was restricted, mood anxious, self-worth impoverished, and insight rather limited. *Id.* Neuropsychological testing revealed critical level scores on the Luria-Nebraska Neuropsychological Battery tests for arithmetic and memory. (R. 328). Weschler Adult Intelligence Scale testing revealed a verbal IQ of 79, performance IQ of 84, and full scale IQ of 79, indicating a borderline range of intelligence. *Id.* Plaintiff scores on the Wide Range Achievement Test were commensurate with his estimated ability, but his spelling scores were extremely low indicating a possible disorder of written expression. (R. 329). His Minnesota Multi-Phasic Personality Inventory II tests were indicative of an individual with lowered defenses, limited coping skills, considerable response to situational stress, and possible exhibition of a plea for help through his responses. *Id.* His diagnostic tests indicated an anxiety disorder, NOS; rule out disorder of written expression; and a GAF of 55. (R. 330).

On October 26, 2004, plaintiff had a medication check with Dr. Marraccini. Plaintiff reported that he had discontinued the Seroquel due to side effects and restarted Neurontin. (R. 289). He reported feeling better on Neurontin and denied anxiety. He expressed concern related to his return to work in the following two weeks, and he reported that OVR had not gotten back to him with regard to other available positions. *Id.* Dr. Marraccini reported that plaintiff's affect was modulated and mood calm. Plaintiff was continued on Neurontin and Ativan, as needed, every other day, and was assessed with a GAF of 55. Plaintiff was also transferred to Dr. Gleditsch. *Id.* On November 1, 2004, plaintiff had a follow-up with Dr. Maine for irritable bowel syndrome related to his anxiety. (R. 348). Plaintiff reported that he was experiencing "great improvement" with Neurontin and was sleeping through the night "pretty well." Plaintiff requested a release to go back to work, but also requested that Dr. Maine limit him to forty-eight hours per week and only day shifts. *Id.* Plaintiff was continued on Neurontin, Bentyl, and Ativan. *Id.* On November 2, 2004, plaintiff met with his therapist and was continued on his medications. *Id.*

Plaintiff attended a medication check-up with Dr. Urrea on December 20, 2004. Dr. Urrea noted that plaintiff's affect was restricted and mood irritated and anxious. (R. 288).

4

Plaintiff reported that he was filing a complaint against his employer due to its failure to accommodate Dr. Maine's letter suggesting that he work a reduced number of hours and days shifts only. Plaintiff's Neurontin and Ativan were reduced and he was assessed with a GAF of 65, indicative of some mild symptoms. *Id.* On January 27, 2005, plaintiff was seen for a follow-up by Dr. Maine regarding his anxiety. (R. 346). Plaintiff reported he was experiencing difficulty sleeping because of his shifting work schedule. Dr. Maine indicated that plaintiff was pleasant, but had pressured speech and was very nervous and anxious. He was started on Doxepin. *Id.* On February 14, 2005, plaintiff was examined by a nurse practitioner in Dr. Maine's office. Plaintiff reported that he did not tolerate the Doxepin and experienced a "hangover" effect when taking it. (R. 345). He was continued on Neurontin and Lorazepam. *Id.* Plaintiff had a follow-up with Dr. Maine on March 14, 2005. *Id.* at 344. Plaintiff reported that he was very upset with his current life situation. He also indicated that he was constantly anxious, nervous, and somewhat depressed. Dr. Maine reported that he was "a little calmer" than he had been on previous visits. *Id.*

Plaintiff had a medication check with Dr. Gleditsch on April 12, 2005. (R. 287). Plaintiff reported that he did not get along with Dr. Urrea or his two previous therapists. He noted that Neurontin helped "smooth out" the anxiety. Dr. Gleditsch noted that plaintiff's affect was restricted with an anxious and irritable mood. He was assessed with a GAF of 65 and his Neurontin and Lorazepam were refilled. *Id.* On May 16, 2005, plaintiff had a follow-up with Dr. Maine. (R. 343). He reported that the Neurontin and Lorazepam were making him lethargic. He also reported that he wanted to feel comfortable talking to someone and did not feel that this need was being fulfilled at Dr. Gleditsch's office. Plaintiff noted that he did feel comfortable talking to Dr. Maine because he listened more than anyone else. Dr. Maine told plaintiff that he would benefit from the services of a psychologist. Plaintiff asked if Dr. Maine would write him excuses from work occasionally due to anxiety. Dr. Maine indicated he would determine the need on a case by case basis. *Id.*

On July 12, 2005, plaintiff had a medication check with Dr. Gleditsch. Plaintiff reported that he had sued his employer. Dr. Gleditsch noted that his affect was restricted and mood anxious and irritable. (R. 286). Plaintiff's GAF was noted as 65 and his Neurontin was decreased. *Id.* On November 11, 2005, plaintiff saw Dr. Nangia, Dr. Maine's colleague, for an

5

exacerbation of irritable bowel syndrome, lack of appetite, and reported overwhelming situation with taking care of his two parents. (R. 339). Dr. Nangia opined that his flare of irritable bowel was due to overwhelming mental stress and gave him time off work. *Id*. Plaintiff was examined again on January 30, 2006 by Dr. Maine. (R. 258). Plaintiff reported that he was experiencing multiple stressors due to taking care of his parents and a lawsuit against his place of employment. Plaintiff also had several physical complaints. Dr. Maine opined that the physical problems could be anxiety related. *Id*.

On March 7, 2006, plaintiff was seen by his therapist and complained of having "a lot going on in his life." (R. 279). Plaintiff presented to have his work papers filled out for the purposes of suing his employer. He also reported that his father was dying of cancer. Plaintiff reported that he began feeling suicidal when taking large amounts of Neurontin. *Id*. Plaintiff presented to a new therapist on March 27, 2006. (R. 277). The therapist noted that he was anxious with a flat affect. He discussed the difficulties of working at night and the case against his employer. He reported difficulty sleeping, anxiety attacks, nervousness, depression, isolating, feeling overwhelmed, and feeling irritable. Plaintiff reported past sexual harassment at work and serving as his parents' caregiver. The therapist noted a mood disorder with anxiety. *Id*. On May 1, 2006, plaintiff reported that he had quit his job to Dr. Maine. (R. 257). Plaintiff followed up with his therapist on July 3, 2006. (R. 273). He reported that the case with his employer was over and that he had signed an agreement for a monetary settlement. He also reported that he did not feel he could deal with OVR because they wanted him to drive to Belle Vernon for a $7 an hour job and he did not feel "mentally ready." He reported panic attacks, trouble sleeping, and unhappiness. He sought reassurance throughout the appointment. *Id*.

On July 31, 2006, plaintiff saw his therapist again and reported that he was doing "alright". (R. 271). He noted taking classes at CareerLink to maintain his unemployment benefits. He reported that he was unsure that he could ever return to work and provided a number of excuses when prompted by the therapist to challenge his negative thoughts. *Id*. Plaintiff returned to Dr. Maine on August 21, 2006. (R. 255). Dr. Maine opined that plaintiff had various stressors in his life, which were contributing to his physical complaints. Plaintiff reported that he was unhappy with Dr. Gleditsch and his therapist because they would not help him pursue social security benefits. He also noted feeling overwhelmed, pressured by OVR, and challenged by his

parents medical problems and the accompanying housework. Dr. Maine opined that while emotional stressors could keep plaintiff from being active in employment, work would take plaintiff out of the house and get his mind on other things. *Id*.

Plaintiff was examined again by Dr. Maine on April 2, 2007. Dr. Maine reported that plaintiff had various stressors including caring for his ailing parents. (R. 250). Dr. Maine noted that plaintiff suffered from anxiety but was intolerant to many medications. Upon examination, plaintiff had a guarded affect but was "not particularly anxious." *Id*. Dr. Maine suggested that plaintiff seek help from a social security attorney. (R. 251). He opined that plaintiff's Propecia, which he was taking for hair loss, might be affecting his anxiety due to fluctuations in testosterone. He advised plaintiff to go off the Propecia for six months, but plaintiff was leery of doing so due to concerns over his "looks." *Id*. On August 27, 2007, plaintiff had a follow-up with Dr. Maine. (R. 494). On examination, Dr. Maine noted that plaintiff was not "excessively anxious." *Id*. Plaintiff was encouraged to see a psychologist and stated that he would "think about it."(R. 495).

On August 4, 2007, plaintiff underwent a consultative examination by Dr. Sandy Vujinovic, a psychiatrist. (R. 296). Plaintiff reported that he experienced panic attacks as often as twice per day where his hands would go numb and he "[couldn't] deal with anything." He also complained of isolating, difficulty sleeping, and being tired. *Id*. Upon mental status examination, Dr. Vujinovic noted that plaintiff had a low average IQ, flat affect, depressed mood, decreased motivation and concentration, suicidal ideation without plan or intent, and no paranoid ideation, delusions, or other evidence of psychosis. (R. 298). Plaintiff refused to attempt serial sevens and performance on other testing was poor. Abstract memory was also noted as being impaired. *Id*. Dr. Vujinovic noted that a review of past treatment suggested "sporadic compliance" and "an inability and unwillingness to consider a significant lifestyle change." (R. 299). Dr. Vujinovic diagnosed dysthymic disorder, generalized anxiety disorder, identity problem, and avoidant personality. *Id*. She opined that plaintiff would have moderate difficulties understanding, remembering, and carrying out detailed instructions; making judgments on simple decisions; interacting appropriately with the public; responding appropriately to pressures in the usual work setting; and responding appropriately to changes in the routine work setting. (R. 293). She also

7

opined that plaintiff would have marked limitations in interacting with supervisors and co-workers. *Id.*

On September 7, 2007, plaintiff's records were reviewed by Dr. Douglas Schiller. Dr. Schiller opined that plaintiff was moderately limited in his ability to maintain attention and concentration for extended periods; perform activities within a regular schedule, maintain regular attendance, and be punctual within customary tolerances; respond appropriately to changes in the work setting; and set realistic goals or make plans independently of others. (R. 306-307). Plaintiff was examined on September 27, 2007 by Dr. Maine. Plaintiff reported he was seeing a psychologist and asked for a refill of his Lorazepam. (R. 493). On January 23, 2008, plaintiff was examined by Dr. Malinak, Dr. Maine's colleague, for a follow-up for his anxiety. (R. 492). Dr. Malinak reported that plaintiff was refusing to be seen by psychiatry because his previous doctor was no longer there. Plaintiff reported that he was seeing a psychologist in town that he did not get along with so that he could apply for social security benefits. Dr. Malinak offered to refer him elsewhere but he refused. Plaintiff reported side effects with many of the anxiety medications he tried. Dr. Malinak noted that he took Neurontin and Lorazepam without side effects, but that his anxiety seemed to be uncontrolled. *Id.*

Plaintiff was seen by Dr. Urrea on February 26, 2008. Plaintiff noted his various stressors. Upon mental status examination, plaintiff was cooperative, initially guarded then more interactive through the session, had a constricted affect and neutral mood, and denied hallucinations. (R. 469-471). Dr. Urrea assessed anxiety and depressive disorder with a GAF of 55. On March 11, 2008, plaintiff saw his therapist. (R. 474). He reported depression, anxiety, and trouble sleeping with low self-esteem. He also noted that treatment with medication had caused side effects in the past. *Id.* Plaintiff reported that he had been looking for other work but had been unsuccessful. *Id.* Plaintiff was examined by Dr. Malinak's nurse practitioner on March 18, 2008. He reported a general apathy towards life. He was encouraged to follow-up with Dr. Urrea and to consider retrying anti-anxiety medications. (R. 490).

On March 26, 2008, plaintiff had a follow-up with his therapist. He reported that he was "falling apart inside" but his therapist noted that he was somewhat vague as to what was causing his anxiety. (R. 473). He claimed he was still not sleeping well due to his shifts being switched year prior. *Id.* Plaintiff had a follow-up with Dr. Malinak on March 31, 2008. He reported that he

would not be able to see a psychiatrist until May. Dr. Malinak indicated that fifty percent of the appointment was spent counseling plaintiff on his anxiety and panic disorders. (R. 489). On April 8, 2008, plaintiff complained of anxiety, low mood, and a pessimistic outlook to his therapist. (R. 472). The therapist noted that plaintiff did not want to work towards change or feeling better. Plaintiff stated that he felt "kicked down" but was unable to give specific examples of this in the recent past. His therapist noted that he presented as "somewhat dramatic." He noted that Neurontin helped but stated that he did not want to take medications that made him feel like a zombie. *Id.* Plaintiff underwent a medication check with Dr. Caroline Poirer on April 23, 2008. (R. 456). Dr. Poirer noted that plaintiff's affect was modulated and mood anxious. Plaintiff noted that he had been given a script for Neurontin by Dr. Malinak but was reluctant to take it and had been off medications for six months during the previous summer. Plaintiff refused a medication increase. *Id.*

On May 8, 2008, plaintiff switched to a new therapist citing a personality conflict with his previous one. (R. 467). He recounted his history of employment problems and difficulties taking care of his mother. Plaintiff reported that his mother relied on him for cooking, cleaning, errands and medical appointments. He presented with a subdued and blunted affect. The therapist also noted that he had a dichotomous thinking style with much negativity. *Id.* On May 15, 2008, plaintiff presented to Dr. Malinak with a flat affect and reported dizziness with an increase of Neurontin. (R. 488). On May 27, 2008, plaintiff was seen by his therapist. (R. 465-466). He reported stress related to his mother receiving home health services and due to her being hospitalized for cardiac difficulties. Plaintiff reported that he was getting more used to his panic episodes and would "simply take an Ativan." Plaintiff presented with a subdued mood with a contextually appropriate affect. The therapist provided psychoeducation and plaintiff was "highly receptive." His therapist noted that no overt anxiety was observed. *Id.*

Plaintiff returned to his therapist on June 19, 2008 and reported that he was continuing to have difficulties caring for his ailing mother. (R. 462). Plaintiff presented with a sad affect. His therapist noted that he continued with "dramatic presentation and verbage." She also noted that he had difficulty setting long and short term goals because he preferred to focus on his discontent for life. When confronted on these issues, he presented excuses and blamed his mother. *Id.* On July 11, 2008, plaintiff underwent a master treatment plan review with his

9

therapist. His therapist noted several ongoing goals and assessed a GAF of 55. (R. 460). On July 30, 2008, plaintiff conferred with Dr. Platto, a physiatrist, who opined that plaintiff's history of depression and anxiety were possibly a "major contributing factor to his perceived disability." (R. 551).

On August 12, 2008, plaintiff met with his therapist and reported being "quite depressed." (R. 458). Plaintiff reported difficulties understanding the legal problems behind putting a septic system on his property and exhibited a "highly pessimistic" view of life in general. Plaintiff presented with a depressed mood and sad affect and displayed "ongoing dramatic presentation and verbage." *Id.* On August 26, 2008, plaintiff reported to his therapist that he needed Lorazepam to "get out the house [that] morning." (R. 457). He expressed concerns about medical problems and his upcoming social security disability hearing. On the same date, Dr. Urrea composed a letter stating that plaintiff was precluded from any meaningful and sustained employment due to his treatment for chronic depression and anxiety related problems. (R. 575). He noted that plaintiff was reclusive and reported agoraphobia. He also reported that plaintiff was compliant with therapy and medications. *Id.* He later opined that plaintiff had been disabled from April 2006. (R. 598).

## II.   Procedural History

Plaintiff protectively filed an application for disability insurance benefits on June 1, 2007. (R.146). Plaintiff alleged disability beginning April 23, 2006. *Id.* Plaintiff's date last insured (DLI) under the Act is December 31, 2011. (R. 11). After plaintiff's initial claim was denied, a hearing was held before the ALJ. (R. 23-76). Plaintiff, who was represented by counsel, and John Panza, an impartial vocational expert (VE) testified at the hearing on September 14, 2007. *Id.* On January 26, 2009, the ALJ found that plaintiff was not disabled. (R. 9-22). Plaintiff filed a request for review with the Appeals Council, but the Appeals Council found no basis for reviewing the ALJ's decision and denied plaintiff's request for review on June 25, 2009. (R. 1-3). After thus exhausting his administrative remedies, plaintiff commenced this action against the Commissioner pursuant to 42 U.S.C. § 405 (g).

When resolving the issue of whether a claimant is disabled and entitled to DIB benefits, the Social Security Administration applies a five step analysis. 20 C.F.R. § 404.1520 (a). The ALJ must determine: (1) whether the claimant is currently engaging in substantial gainful

activity; (2) if not, whether the claimant has a severe impairment; (3) if the claimant has a severe impairment whether it meets or equals the criteria listed in 20 C.F.R. pt. 404. subpt. P, app. 1; (4) if the impairment does not satisfy one of the impairment listings, whether the claimant's impairments prevent him from performing her past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy, in light of his age, education, work experience and residual functional capacity. 20 C.F.R. § 404.1520. In all but the final step, the burden of proof is on the claimant. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993).

In this case, the ALJ determined that plaintiff was not disabled at the fourth step of the sequential evaluation process. (R. 11-22). He concluded that plaintiff asthma; chronic obstructive pulmonary disease (COPD); degenerative joint disease with possible mild left L5 radiculopathy; depressive disorder, NOS; generalized anxiety disorder; and avoidant personality disorder, which were deemed to be a combination of severe impairments under 20 C.F.R. §§ 404.1520 (c). (R. 11). The ALJ determined, however, that these impairments did not meet or medically equal an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. (R. 20). The ALJ concluded that plaintiff was able to perform his past relevant work as an extruder operater. (R. 21). Furthermore, he determined that plaintiff could perform work at the medium exertional level with consideration of the following non-exertional limitations: right-hand dominance; avoidance of concentrated exposure to fumes, odors, dusts, gases, or areas of poor ventilation; understanding, remembering, and carrying out no more than short simple instructions (i.e. one-to-five step tasks); no more than occasional decision-making; no more than occasional adjustment to changes in the work setting; only simple, routine, repetitive tasks; and no interaction with the general public. (R. 19). As a result, the ALJ concluded that plaintiff was not under a disability at any time starting on April 23, 2006. (R. 21).

## III. Analysis

In support of his motion for summary judgment, plaintiff makes several arguments. First, he argues that the ALJ erred in disregarding the opinion of Dr. Urrea that plaintiff was incapable of sustained work. (Br. for Plaintiff at 6-25). Second, he contends that the ALJ failed to consider his employment record when assessing his credibility. ( Id. at 26-28). Finally,

11

plaintiff claims that the aforementioned errors led to an incomplete residual functional capacity and hypothetical. (Id. at 29-34). The Court will proceed to address each argument.

### Weight Given to the Opinion of Dr. Urrea

Plaintiff argues that the opinion of Dr. Urrea was unopposed by any contrary medical evidence. Plaintiff suggests that this report should have been given great weight and was ignored along with Dr. Urrea's records, the records of Dr. Maine, and the consultative records of Dr. Vujnovic. (Pl. Brief at 6).

A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." *Morales v. Apfel*, 225 F.3d 422, 429 (3d. Cir. 1999), quoting, *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999). However, for controlling weight to be given to the opinion of a treating physician that opinion must be "well supported by medically acceptable clinical and laboratory diagnostic techniques and [ ] not inconsistent with other substantial evidence." 20 C.F.R. §§404.1527 (d)(2), 416.972 (d)(2).  An ALJ may reject a treating physician's opinion outright on the basis of contradictory medical evidence, but may afford a treating physician's opinion more or less weight depending upon the extent to which supporting explanations are provided. *Newhouse v. Heckler,* 753 F.2d 283, 286 (3d Cir.1985). There are several factors that the ALJ may consider when determining what weight to give the opinion of the treating physician. 20 C.F.R. §404.1527, 416.927 (d)(2). They include the examining relationship, treating relationship (its length, frequency of examination, and its nature and extent), supportability by clinical and laboratory signs, consistency, specialization, and other factors. 20 C.F.R. §404.1527 (d), 416.927 (d).Generally, an ALJ may not make speculative inferences from medical reports and is not free to employ his own expertise against that of a physician who presents competent medical evidence. *Fargnoli v. Massanari ,* 247 F.3d 34, 37 (3d Cir. 2001). When a conflict in the evidence exists, the ALJ may choose whom to credit but "cannot reject evidence for no reason or for the wrong reason." *Mason v. Shalala,* 994 F.2d 1058, 1066 (3d Cir.1993). The ALJ must consider all the evidence and give some reason for discounting the evidence he rejects. *Stewart v. Secretary of H.E.W.,* 714 F.2d 287, 290 (3d Cir.1983).

The ALJ gave "less weight" to the opinion of Dr. Urrea for two reasons: 1) it was inconsistent with the medical record and 2) it was dispositive and conclusory on the issue of disability. (R. 21). The ALJ included significant discussion of the medical record in his opinion. He noted that plaintiff was diagnosed with generalized anxiety disorder, depressive disorder, and avoidant personality disorder. (R. 11). He discussed plaintiff's GAF assessments of between 55 and 65, which are indicative of some mild symptoms to moderate symptoms, along with the relevant psychologist and therapist records. (R. 12-18). He also discussed the consultative examination of Dr. Vujinovic from August 2007. (R. 14).

Dr. Urrea based his opinion on plaintiff's "reported agoraphobia" and compliance with therapy and medications. The record reveals, however, that plaintiff consistently refused further treatment with medication or changes in medication after he experienced side effects with others, and went through periods of minimal treatment with psychologists or therapists. (R. 251, 472, 490, 492). He consistently refused recommendations by his primary care physician, Dr. Maine, to return to treatment with a psychologist or psychiatrist and to stop taking Propecia. *Id.* These records were noted by the ALJ along with Dr. Vujinovic's opinion that plaintiff exhibited "sporadic compliance" with treatment. (R. 299). In addition, plaintiff was never diagnosed with agoraphobia by any physician, psychologist, psychiatrist, or therapist. Finally, Dr. Urrea only treated plaintiff twice, in December 2004 and February 2008. (R. 288, 469-471). The ALJ noted that Dr. Urrea assessed Plaintiff with a GAF of 55 in February 2008, which is indicative of moderate symptoms. (R. 15). This conflicts with Dr. Urrea's later opinion that plaintiff was totally disabled. It is therefore evident, based on the ALJ's thorough analysis, that his assignment of weight was supported by substantial evidence.

### Plaintiff's Work History and Credibility

Plaintiff also argues that the ALJ erred in assessing his credibility by disregarding plaintiff's employment record. Testimony regarding physical and mental capacities and limitations from an individual with a continuous work record is entitled to substantial credibility when other significant evidence does not discount that testimony. *See Dobrowolsky v. Califano*, 606 F.2d 403, 409 (3d Cir. 1979). Although plaintiff contends that the ALJ totally discounted his employment record, it is evident from the opinion that he did give due consideration to this

information. (R. 20). The ALJ noted plaintiff's long-term employment and the fact that it was ended by plaintiff's harassment suit and settlement in plaintiff's favor. *Id.*

The ALJ supported his finding that plaintiff's testimony was "not entirely credible" with evidence of plaintiff's activities, his sporadic compliance with treatment, and notations from his treating mental health providers. The ALJ relied on plaintiff's ability to care for both of his ailing mother and maintain his household during the period in question. (R. 250, 467). As discussed above, he also relied on plaintiff's failure to comply with treatment at various times starting in April 2006. (R. 251, 472, 490, 492). Finally, he indicated several notations from plaintiff's therapists that he was being "dramatic" and could not give concrete examples of the causes of his anxiety.[2] (R. 458, 462, 472). This finding, therefore, was supported by substantial evidence.

### Residual Functional Capacity and Hypothetical

Finally, plaintiff makes three arguments relating to the ALJ's residual functional capacity determination and the preceding hypothetical to the vocational expert. First, plaintiff argues that the ALJ failed to take into account the frequency of plaintiff's panic attacks. Second, plaintiff argues that the ALJ failed to specifically include Dr. Vujinovic's suggestion that plaintiff was markedly limited in his ability to interact appropriately with supervisors and co-workers. Finally, he argues that the ALJ failed to include Dr. Vujinovic's suggestion that plaintiff was moderately limited in his ability to respond appropriately to pressures in the usual work setting.

The ALJ gave some weight to both of the state agency consultants, Dr. Vujinovic and Dr. Schiller, but did not give great weight. (R. 21). He noted Dr. Vujinovic's finding that plaintiff only sporadically treated for his mental ailments, and in light of this, did not fully accept her assessment of plaintiff's abilities. He also noted, through his discussion of the medical record, that none of plaintiff's treating physicians, psychologists, or therapists noted specific limitations on plaintiff's abilities. As noted above, Dr. Urrea composed a letter opining that plaintiff was

---

[2] Plaintiff devotes significant argument to the ALJ's statement that plaintiff was seeking social security disability benefits for secondary gain while he cared for his mother rather than working. While the reasoning behind this statement may be flawed, the Court notes that this is not an error requiring remand, as the ALJ's credibility finding was supported by other substantial evidence.

14

disabled, but did not give detailed reasons as to his rationale for that conclusion. The ALJ also engaged in a thorough discussion of the medical and psychological record, which evidences the fact that, other than his difficulties with his previous employer relating to harassment, there was no suggestion that plaintiff could not deal with co-workers, supervisors, or occasional work pressures. The ALJ was not bound by Dr. Vujinovic's assessment, as she did not treat plaintiff and there is further ample evidence that plaintiff suffered from no more than mild to moderate unspecified symptoms throughout his treatment. The ALJ did accept some assessments of plaintiff's limitations, as they were well-supported in the record, and properly incorporated them into his residual functional capacity. The fact, however, that he did not accept those argued by plaintiff was not error.

The record also failed to establish, with any degree of certainty, the effect of plaintiff's reported panic attacks, on his ability to work. These attacks were noted by the ALJ in his discussion of the medical record. The evidence of these attacks, however, were mainly self-reports by plaintiff. (R. 273, 465-466, 489). As noted above, the ALJ properly limited the weight given to plaintiff's credibility. The ALJ, therefore, was not required to accept plaintiff's testimony that he experienced four panic attacks a week, lasting 30-45 minutes a piece, during an eight hour period.

**Conclusion**

For the preceding reasons, this Court denies plaintiff's motion for summary judgment (Doc. No. 6) and grants defendant's motion for summary judgment (Doc. No. 8).

AND NOW, this 24 day of April, 2010, IT IS HEREBY ORDERED that plaintiff's motion for summary judgment (Doc. No. 6) is DENIED and defendant's motion for summary judgment (Doc. No. 8) is GRANTED.

BY THE COURT:

_____, C. J.

cc:    All Counsel of Record

15